IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAUREN KRUPA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of the | : | |
| Social Security Administration | : | No. 05-CV-0670 |

Ditter, S.J.                                                           May  31, 2006

MEMORANDUM AND ORDER

Lauren Krupa filed this action under 42 U.S.C. §405(g) requesting review of the

Commissioner's denial of a claim for disability insurance benefits ("DIB") under Title II of the

Social Security Act ("Act").  After careful consideration of the record, the parties' cross-motions

for summary judgment, and the oral arguments of counsel, I find the decision of the

Administration Law Judge ("ALJ") that Krupa was not disabled under the Act is supported by

substantial evidence.  Accordingly, Krupa's motion is denied, and the Commissioner's motion is

granted.

1. Factual and Procedural History

Krupa filed her application for DIB on January 23, 2003, alleging disability beginning

March 6, 2001, due to multiple impairments including degenerative disc disease, arthritis,

neuralgia, diffuse arthralgia, fibromyalgia, and depression.  Her application was denied and she

requested an administrative hearing.  A hearing was held on May 20, 2004, and testimony was

received from Krupa and Gary Young, a vocational expert.  During the hearing, Krupa amended

her disability onset date to December 19, 2002.

Krupa was born on November 25, 1951.[1]  Krupa has a high school education plus four years of college and a librarian certificate.  Her past relevant work included employment as a librarian and as an organist, both of which the vocational expert identified as light exertional work.  Krupa lives in an apartment with her disabled husband.  She is able to drive, grocery shop, read the bible, watch television, ride a bus to Atlantic city, share the household chores with her husband, and do some cooking.

1. Pre-onset date medical history

Krupa sustained a low back injury in a motor vehicle accident in November 1988 and a neck injury in August 1999.  After each accident, Krupa missed some work but was able to return to full-time employment.  Krupa also has a history of bursitis and tennis elbow.

In February 2000, Krupa was first evaluated by Christine Hinke, M.D., of the physical medicine and rehabilitation department of Coordinated Health Systems (CHS) Professional Practice.  Dr. Hinke was Krupa's treating physician through November 2002.  During the course of this treatment, Krupa was prescribed increasing doses of potentially addictive narcotic pain medications, including vicodin, lorcet, oxycondone, and percocet.  Krupa's activities were not limited until June 20, 2000, when she reported increasing low back pain that Krupa attributed to a night of dancing at her wedding in May 2000.  At that time, Dr. Hinke recommended Krupa follow-up with Nathan Schwartz, M.D., a pain management specialist at CHS who would administer epidural steriod injections.  Dr. Hinke did not prohibit Krupa from working, but put

---

[1] During the relevant period, Krupa was considered an individual closely approaching advanced age (between 50 and 54).  *See* 20 C.F.R. 404.1563.

2

her on "modified activity" with maximum lifting of 20 pounds and frequent carrying of 10 pounds; walking, standing and occasional sitting with push/pull; no kneeling, bending or squatting; no prolonged standing; and frequent alternation of positions. (Tr. 289). However, a June 27, 2000 MRI showed no change from MRI's conducted six months earlier or in 1998. (Tr. 281-82, 284-85). At a follow-up examination in July, Krupa's activities remained the same. (Tr. 282).

In August 2000, Krupa reported that her lower back was feeling much better after a lumbar injection, and that her neck pain remained constant at a very low level. Although Krupa was tolerating more activity, Dr. Hinke recommended limiting Krupa's work activities further "to allow her to continue to improve." (Tr. 271). At this time, Krupa was limited to working a maximum of six hours per day; lifting 1-10 pounds; sitting, occasional walking and standing; no kneeling, bending or squatting; with a sit/stand option as needed. *Id.*

Krupa's limitations remained essentially the same until February 2001. Following a phone call from Krupa in which she reported escalating symptoms, and increasing difficulty doing things at work, Dr. Hinke restricted her from any work activity until additional testing results were obtained. (Tr. 236). An MRI of Krupa's brain was unremarkable and showed no evidence of "any demyelinating process such as MS." (Tr. 235). In March, Krupa was evaluated for diffuse joint pain, fatigue, and flu-like symptoms. With a normal MRI and blood work that was essentially normal, Dr. Hinke referred Krupa to Sylvan Brown, M.D., to evaluate her joint pain and continued to restrict Krupa from any work activity. (Tr. 231-34). Dr. Brown diagnosed

inflammatory polyarthritis for which he prescribed celebrex and small doses of prednisone.[2]  (Tr. 230).  At Krupa's next visit with Dr. Hinke she was referred to Dr. Schwartz (for injections or acupuncture), and ordered to continue treatment with Dr. Brown, remain out of work, use bilateral wrist splints, and her home activities were further limited to below the sedentary exertional level.  (Tr. 229).

On April 23, 2001, Dr. Brown reported Krupa was doing much better.  Krupa was on a small dose of prednisone with plans to taper off her use unless she had a recurrence.  (Tr. 226).  There are no additional treatment notes from Dr. Brown and Krupa reported she was discharged from Dr. Brown's care in June, 2001.  (Tr. 200).  In May and June 2001, Dr. Schwartz administered cervical and lumbar epidural injections.  (Tr. 196-97, 207-11, 215-16).  Her condition and limitations remained the same during this period and through the end of the year.  (Tr. 177).

Krupa continued treatment with Dr. Hinke in 2002.  In February 2002, Dr. Hinke recounts that Krupa was initially cleared to work light duty but "her job could not continue to accommodate this so she is therefore no longer working."  (Tr. 171).  At that time, Krupa was being "maintained on double medications" and "unable to return to gainful employment because of progressive fatigue and arthralgias."  *Id.*  Dr. Hinke referred Krupa for a second opinion because she was concerned that Krupa was still on prednisone without a "clear cut diagnosis from a rheumatologist," and because of the dangers of long term use.  (Tr. 173).  In March 2002, Dr. Hinke still did not have "a good diagnosis" for Krupa, and added oxycondone to her other

---

[2] Prednisone is an oral, synthetic corticosteroid used for suppressing the immune system and inflammation.  *See* http://www.medicinenet.com/prednisone/article.htm (last visited May 20, 2006); *Dorland's Illustrated Medical Dictionary* 1500 (30th ed. 2003).

pain medications.  (Tr. 169-70).

In June 2002, MRIs of the neck and back showed mild to moderate cervical spondylosis (spinal arthritis), minimal degenerative changes in the lumbar spine, bilateral moderate neural foramen narrowing, and no evidence of focal disc herniation.  (Tr. 115-16).  Krupa's complaints persisted so her medication was increased and a nerve conduction study was ordered.  A July 1, 2002 EMG was abnormal and evidenced a right lower extremity radiculopathy,[3] a mild to moderate right upper extremity radiculopathy, and mild to moderate left cervical radiculopathy. (Tr. 153-54-5).  In September, Krupa continued to complain of diffuse body pain and reported only a partial response to her opiod medications.  Dr. Hinke was still awaiting a diagnosis from the rheumotologist.  (Tr. 143-45).  Krupa was also experiencing right shoulder pain.  She received an injection for the shoulder pain and her medication dosages were increased.  (Tr. 141). In October, Krupa reported good results from the shoulder injection and her prescribed medications.  (Tr. 137-38).  Her increase in pain was attributed to the reduction of prednisone. Although she remained out of work with significant limitation of her home activities, Krupa was to follow a home exercise and walking program.  (Tr. 139).

Krupa's last visit with Dr. Hinke was on November 26, 2002.  Krupa's exertional limitations remained the same.  There was still no rheumotological diagnosis and Dr. Hinke continued to attribute Krupa's symptoms to the discontinuance of prednisone.

In December 2002, during the weeks immediately preceding her onset date, Krupa had

---

[3] Radiculopathy is a term used to describe pain, and other symptoms like numbness, tingling, and weakness in the arms or legs often caused by direct pressure from a herniated disc or degenerative changes in the lumbar spine that cause irritation and inflammation of the nerve roots.  *See* http://www.back.com/symptoms-radiculopathy.html (last visited May 19, 2006); *Dorland's* 1562.

medical appointments with Francis Salerno, M.D., of LVPG Internal Medicine; Marzena L. Bieniek, M.D., of East Penn Rheumatology Associates; and Christopher Pogodzinski, M.D., of Nazareth Area Family Medicine Associates.

Krupa was examined by Dr. Salerno on December 2, 2002, and reported a history of chronic neck and low back pain, as well as arthritic joint pain.  She also reported intermittent depression, but said that she was feeling better since her son had returned home.  Krupa's physical examination was essentially normal, except for mild obesity, thin hair, dry skin, an enlarged thyroid, depressed reflexes, and some positive trigger points.  She had good motor strength, and good range of motion ("she was able to touch practically her forehead on the ground without any difficulty").  (Tr. 321).  She had no sensory deficits, no focal neurologic findings, and a normal mental status examination.

Krupa advised Dr. Salerno that she and her husband were chronic marijuana users and occasional alcohol users.  Krupa also reported she had been taking oxycodone and percocet for the last two to three years.  Dr. Salerno was concerned that she was addicted to narcotics and noted she may need family intervention and a referral to Narcotics Anonymous.  Dr. Salerno recommended further testing, yoga, walking, exercise, and a reduction of narcotic medication.  Krupa saw Dr. Salerno one more time, on January 21, 2003, and his assessment and recommendations remained the same.  Dr. Salerno's notes do not list any restrictions on Krupa's physical activities.  (Tr. 317-22).

Dr. Bieniek examined Krupa on December 9, 2002.[4]  Krupa reported that she was feeling

---

[4] Krupa began treatment with Dr. Bieniek on July 29, 2002, for evaluation of chronic low back and neck pain.  Dr. Bieniek also noted that Krupa had a history of inflammatory arthritis of the hands, and that she might be suffering from fibromyalgia.  (Tr. 120-21).  Krupa saw Dr. Bieniek in August, October, and November 2002.

much better since starting back on prednisone.  Dr. Bieniek recommended that Krupa walk, swim, and exercise regularly.

Dr. Pogodzinski examined Krupa on December 18, 2002.[5]  Krupa reported that she had numbness in her right hand for the prior month.  She was referred for an orthopedic evaluation and advised to avoid elbow trauma.  (Tr. 324).  The record does not include any subsequent examinations by Dr. Pogodzinski.  (Tr. 323-39).

2. <u>Post-onset date medical history</u>

Krupa's first medical appointment after her onset date was on January 9, 2003, with Scott Stoll, M.D.  Dr. Stoll had replaced Dr. Hinke as Krupa's treating physician at CHS.  Dr. Stoll noted that Dr. Hinke had treated Krupa for chronic neck and back pain with radiculopathy, and that Krupa was also being followed by a rheumatologist and treated with prednisone for arthralgias.  At the time of his examination, Dr. Stoll found Krupa was stable with good pain relief from a combination of narcotic medication and patches.  Dr. Stoll observed Krupa to be a "pleasant, well appearing female in no acute distress," with a free range of motion in the cervical spine, minimal tenderness over the trapezius and spinous processes, reported tenderness over the right elbow with decreased sensation in an ulnar nerve distribution to the right hand, a negative Tinel's sign[6] over the cubital tunnel, negative Hoffmann's sign,[7] normal strength, equal reflexes,

---

[5] Krupa began seeing Dr. Pogodzinski as a primary care physician on February 1, 2002.  She reported suffering from chronic low back pain and he recommended continued home physical therapy exercises and continued follow-up with her physiatrist, Dr. Hinke.  Dr. Pogodzinski expressed his concern with her prolonged use of prednisone and recommended a DEXA scan (for osteoporosis) and yearly ophthalmology examinations for possible cataracts.  (Tr. 335).  Krupa next saw Dr. Pogodzinski on July 5, 2002, complaining of ankle and hand swelling after a flu shot.  (Tr. 324).

[6] Tinel's sign is an examination used by doctors to detect an irritated nerve. Tinel's sign is performed by lightly banging over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve. For example, in a person with carpal tunnel syndrome where the median nerve is compressed at the wrist, Tinel's sign is often "positive" and causes tingling in the thumb, index, and middle fingers.

and a nonantalgic heel-toe gait.  (Tr. 506).

Dr. Bieniek examined Krupa, post-onset date and for the last time, on January 13, 2003. Krupa's condition was generally unchanged.  Krupa had stopped smoking, was walking twice a week, looked much thinner, could make a good fist with both hands, and had a normal range of motion, despite some lumbar and cervical tender points.  She was scheduled for an EMG and nerve conduction studies because of numbness in her right hand.  Dr. Bieniek no longer listed fibromyalgia as a possible diagnosis, and he again encouraged Krupa to exercise regularly.  Dr. Bieniek did not place any limitations on Krupa's activities.  (Tr. 117-121).

A January 14, 2003 EMG of the right arm and elbow was abnormal, revealing significant nerve entrapment, but no evidence of radiculopathy.  Dr. Stoll's examination of Krupa revealed a mild dowager's hump in the cervical spine, limited rotation, a positive ulnar Tinel's sign, ulnar tenderness, cervical tenderness without identifiable trigger points, a negative median Tinel's sign, equal pulses and reflexes, normal strength, and no muscle atrophy.  (Tr. 124-26).

On January 21, 2003, Krupa had a second visit with Dr. Salerno.  Dr. Salerno noted that Krupa was scheduled for ulnar release surgery the following week.  Bone density studies revealed some significant osteopenia in her lumbar spine and hip, but no true osteoporosis.  Dr. Salerno examined Krupa and found that her vital signs were normal and stable; her lungs were clear; her cardiovascular system was normal (despite moderate obesity); and she was quite

_See_ http://www.medterms.com/script/main/art.asp?articlekey=16687 (last visited May 5, 2006); _Dorland's_ 1703.

[7] Hoffman's sign is a neurological sign in the hand which is an indicator of problems in the spinal cord.  It is associated with a loss of grip. The test for Hoffman's sign involves tapping the nail on the third or forth finger.  A positive Hoffman's is the involuntary flexing of the end of the thumb and index finger - normally, there should be no reflex response.  Hoffman's sign is an indicator of a number of neurological conditions including cervical spondylitis, other forms of spinal cord compression, and multiple sclerosis.
_See_ http://www.mult-sclerosis.org/Hoffmanssign.html (last visited May 5, 2006); _Dorland's_ 1699.

flexible (able to touch her toes and move her head in all directions). Dr. Salerno diagnosed chronic pain syndrome and recommended Krupa start a program of yoga and stretching exercises. He also prescribed medication to prevent osteoporosis and advised Krupa about the potential for becoming addicted to her opiate pain medication. (Tr. 317-18).

In April 2003, Krupa's medical records were reviewed by a state agency physician, Gerald A. Gryczko, M.D., and she was referred for a consultative psychological evaluation with Herbert Machowsky, Ed.D. Dr. Gryczko opined that Krupa had the ability to perform a range of sedentary work. (Tr. 341). However, at this time Krupa had not yet amended her onset date to December 2002, and Dr. Gryczko relied on the treatment notes prior to Krupa's onset date. This evaluation also occurred prior to her cessation of all treatment.

Dr. Machowsky found that Krupa was oriented in all spheres; that her speech was fully comprehensible, rapid, glib, clipped and spontaneous with attempted humor and side comments; and that she exhibited indicators of generally high, cognitive functioning. Her mood was mildly dysthymic but grossly appropriate. Krupa did not exhibit any delusional thinking or impulse problems, and her recent memory was intact. Krupa denied perceptual disturbances, hallucinations, obsessions, and suicidal or homicidal thoughts. She acknowledged that she was able to shop independently, cook, clean, maintain her residence and her appointment schedule, pay her bills, and care for her personal needs. Dr. Machowsky's diagnostic impression was that Krupa was suffering from a pain disorder associated with both psychological factors and a general medical condition. He also wanted to rule out drug abuse and a possible addiction to pain medication. Dr. Machowsky opined that Krupa had a fair to good ability to perform all work-related mental activities, including a good ability to function independently, interact with

supervisors, and understand, remember, and carry out even complex job instructions.  (Tr. 348-53).

Krupa's records were also reviewed in April 2003, by a state agency psychologist, Linda Mascetti, Ph.D.  (Tr. 354-66).  According to Dr. Mascetti, Krupa had a diagnosed affective disorder with some reported symptoms of depression; however, her functioning was not significantly limited by mental factors; she had experienced no episodes of decompensation, and she had no more than mild restrictions of activities of daily living, social functioning, and concentration, persistence or pace.  Thus, Dr. Mascetti opined that Krupa's mental impairments were not severe.  *See* 20 C.F.R. 404.1520a(d)(1) (ratings of none and mild are generally indicative of a non-severe mental impairment).

In June 2003, Krupa was seen by Sergio Rudoi, Jr., P.A.C., a physician's assistant under the supervision of Dr. Stoll.  Krupa continued to complain of diffuse joint, low back, neck, and arm pain.  Mr. Rudoi noted that Dr. Nathan Schwartz of CHS was treating Krupa for chronic pain, and that she had undergone a series of epidural and facet injections with minimal benefit.  Krupa was no longer taking oxycodone and percocet, but she was using a duragesic patch for pain, and taking the anti-depressant medications, ativan and elavil.  Krupa said she was unhappy with Dr. Schwartz's treatment and was looking for another physician to manage her chronic pain.

On physical examination, Rudoi described Krupa as "pleasant and in no acute distress." He noted that she walked with a nonantalgic gait, and had a full range of motion in her cervical and lumbar spine with grossly neurovascularly intact upper and lower extremities, despite some tenderness in the trapezia.  After refilling her prescriptions, Rudoi advised Krupa that Dr. Stroll was not the appropriate physician for continued management of her chronic pain because his

10

practice deals more with acute pain and sports medicine.  He provided the names of two local

pain clinics and a card for acupuncture.  Rudoi noted Krupa should not return to work until she

followed up with pain specialists outside his group or with Dr. Schwartz.[8]  Rudoi advised Krupa

to see a pain specialist before her prescriptions ran out in order to avoid withdrawal, and Krupa

was discharged from Stroll's care.  (Tr. 491-93).  There is nothing in the record to indicate Krupa

followed through with this recommendation and sought treatment from a chronic pain specialist.

On November 3, 2003, Krupa was evaluated by a therapist at New Directions treatment

services.  Krupa's chief complaint was depression due to chronic pain and financial stress.  She

reported mood changes, loss of energy, racing thoughts, short-term memory problems,

nightmares, inattention, and somatic complaints.  Krupa said that she had been fired from her job

as a librarian.  For the first time, Krupa reported a history of rape and abuse, despite her prior

denials of any such incidents, and she acknowledged a history of drug and alcohol use.  Krupa

was appropriately dressed but unkempt.  She was cooperative and had relevant and goal-directed

speech, but also had a flat affect and ideas of hopelessness.  Her thought processes, motor

activity and eye contact were normal, but her recent memory was poor.  Krupa's judgment was

adequate, her insight was moderate, she was oriented in all spheres, and she exhibited no

evidence of delusions or hallucinations.  The therapist recommended that Krupa enter individual

counseling for treatment of a depressive disorder and scheduled a psychiatric evaluation with

Carlos M. Velas, M.D.  (Tr. 604-11).

Krupa had an initial psychiatric evaluation with Dr. Velas on November 20, 2003.  Dr.

---

[8] Because Rudoi was not a physician, this does not constitute a medical opinion.  *See* 20 C.F.R. § 404.1513(a) (physician's assistants are not acceptable medical sources).

Velas reported that Krupa was properly dressed and groomed, her affect was appropriate but anxious, she exhibited psychomotor retardation, her mood was depressed, and her speech was soft, however, she maintained good eye contact, and there was no evidence of psychosis or suicidal or homicidal ideations.  Dr. Velas diagnosed a major depressive disorder that was recurrent and moderate.  He prescribed anti-depressant medications, recommended individual therapy, and made a referral to a twelve-step program for the treatment of Krupa's substance abuse and dependence.  Krupa's medications were refilled twice in December 2003, and finally on January 12, 2004.  (Tr. 612-15).  The record does not include any additional records of mental health or substance abuse treatment.

On August 16, 2004, the ALJ issued his decision finding Krupa's depression was not a severe impairment but her degenerative disc disease of the cervical spine and chronic low back pain were severe impairments.  However, these impairments, alone or in combination, did not meet or equal a disabling impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1.[9]  The ALJ found that Krupa retained the ability to perform light work activity,[10] and given this residual functional capacity, Krupa was able to perform her past relevant work as a librarian and organist. Alternatively, the ALJ concluded Krupa could also perform other light work, and consistent with the Commissioner's medical-vocational guidelines, the ALJ found her not disabled.  *See* 20

---

[9] The Listing of Impairments is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background.  *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).  The listing defines impairments that would prevent an adult, regardless of age, education, or work experience, from performing "any" gainful activity, not just "substantial" gainful activity.  *See* 20 C.F.R. § 404.1525(a) (purpose of the listings is to describe impairments "severe enough to prevent a person from doing any gainful activity").  The listing was designed to operate as a presumption of disability making further inquiry unnecessary.  *Sullivan*, 493 U.S. at 532.

[10] Light work requires a good deal of walking or standing and involves lifting no more than 20 pounds at a time.  *See* 20 C.F.R. §§ 404.1567(b).

C.F.R. §§ 404.1520(f)(g), 404.1560(b)(3), 404.1569; and 20 C.F.R. pt. 404, subpt. P, app. 2, table 2, rules 202.14 and 202.15.

3. <u>Standard of Review</u>

Well-known principles govern this matter. The role of this court on judicial review is to determine whether there is substantial evidence in the record to support the Commissioner's final decision. The factual findings of the Commissioner must be accepted as conclusive, provided that they are supported by substantial evidence. Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It is more than a mere scintilla but may be less than a preponderance. If the ALJ's conclusion is supported by substantial evidence, this Court may not set aside the Commissioner's decision even if it would have decided the factual inquiry differently.

The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims. This five-step evaluation is codified at 20 C.F.R. § 404.1520. A claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1520. The claimant satisfies her burden by showing an inability to return to her past relevant work. *Rutherford v. Barnhart*, 399 F.3d 546, 551. Once this showing is made, the burden shifts to the Commissioner to show that the claimant, given her age, education, and work experience, has the ability to perform specific jobs that exist in the economy. 20 C.F.R. § 404.1520; *Rutherford*, 399 F.3d at 551.

The ALJ must seriously consider subjective complaints of pain, which may support a

claim for benefits, especially when the complaints are supported by medical evidence.  *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).  The claimant's subjective complaints of pain must bear some relationship to her physical status, as demonstrated by objective medical findings, diagnoses, and opinions.  20 C.F.R. § 404.1529; *see also Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974).  The ALJ may discredit a claimant's complaints of pain when:  (1) there is contrary medical evidence in the record; and (2) the ALJ explains the basis for rejecting the complaints.  *Mason*, 994 F.2d at 1067.

If medical signs or laboratory findings show that the claimant has a medically determinable impairment that could produce pain, the ALJ must consider all available evidence, including the claimant's statements, to determine whether and how the symptoms limit the claimant's capacity to work.  20 C.F.R. § 404.1529(c)(1).  Other factors relevant to evaluating subjective complaints of pain include the claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type dosage, effectiveness and side effects of any medication she takes or has taken to alleviate her pain or other symptoms; treatment, other than medication, she receives or has received for relief of pain or other symptoms; any measures she uses or has used to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain or symptoms.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

4. <u>Discussion</u>

Krupa asserts she is incapable of performing any substantial gainful activity.  She contends the ALJ erred in: 1) concluding her mental impairment was not severe; 2) finding she could perform a full range of light exertional work; 3) finding she had transferrable skills in the

absence of vocational testimony; and 4) not fully crediting her subjective complaints of pain. After carefully reviewing the record, I conclude the ALJ's decision is supported by substantial evidence.

First, Krupa claims that the ALJ ignored Dr. Velas' diagnosis of a major depressive disorder and improperly relied on the consulting examiner's opinion in determining that her mental impairment was not severe. This claim is not supported by the record. The ALJ reviewed the records provided by New Directions and discussed Dr. Velas' diagnosis. Considering the timing (after applying for benefits), the short duration (less than four months), the functional assessments of her psychologist and psychiatrist (revealing no more than mild limitations and a fair to good ability to perform work-related mental activities), and the limited nature of her treatment (anti-depressant medication and counseling), the ALJ's conclusion was reasonable and supported by substantial evidence.

Next, Krupa challenges the ALJ's determination that she retained the ability to perform light work. This claim is related to her assertion that the ALJ erred in finding her subjective complaints were not wholly credible because these findings are dependent on each other. Krupa testified that she suffered from such debilitating pain that she could not perform any work activity. However, this testimony is contradicted by her admitted daily activities, including the ability to travel to Atlantic City on casino trips. The ALJ specifically noted that the inconsistencies in Krupa's testimony, the lack of continuing treatment for her musculoskeletal complaints, and her short-lived mental health treatment impacted his credibility determination.

The ALJ did not address what effect, if any, Dr. Hinke's pre-onset date assessment of Krupa's functional limitations had on the disability determination. When Dr. Hinke last

15

examined Krupa on November 26, 2002, her treatment note indicated the following:

> Patient to remain out of work.  She is cleared for home activities of
> lifting 1-5 lbs., sitting mostly, occasional walking and standing as
> tolerated, no lifting over the shoulder, no kneeling, bending or
> squatting, rest and recumbent position and avoid fatigue.

(Tr. 133).  Only one of the treatment notes of her post-onset date examinations contains any

functional limitations or comments on her ability to work, and that note was by a non-physician

at the time Krupa was being discharged from treatment with Dr. Stoll.

As a result, I asked counsel to file supplemental briefs and heard oral argument on the

following questions:

> 1.  Whether findings of physicians concerning a claimant's ability
> to lift, stand, walk, and sit, made prior to a period of disability, are
> presumed to be continuing and if so, for how long;
>
> 2.  Whether the absence of any comment about a claimant's ability
> to lift, stand, walk, and sit constitutes evidence to rebut any
> presumption from prior findings; and
>
> 3.  Whether the absence of any comment concerning such
> functional limitations constitutes substantial evidence that she can
> perform such activities.

The parties agree that there is an absence of precedent on these issues, and that the

resolution of these issues is controlled by the particular facts of the case.  Of course, the parties

have provided vastly different interpretations of those facts.  The record reveals that Dr. Hinke

imposed significant functional limitations on Krupa at a time preceding her alleged inability to

work.  Throughout the course of Krupa's treatment with Dr. Hinke, these limitations were

adjusted or restated in her treatment notes after each visit.  However, upon the transfer of her

treatment to a different doctor within this same practice, Krupa's treatment notes no longer

16

included such limitations or any reference to her ability to work.  Moreover, the focus of Krupa's treatment changed from obtaining a diagnosis to explain the cause of her various complaints, to the reduction of Krupa's dependence on narcotic pain medications.  Krupa's visits were less frequent, and by June 2003, her treatment had ceased altogether.

After reviewing the applicable regulations and social security rulings ("SSR"), I have considered Krupa's pre-onset medical record for the limited purpose of determining if it would effect my ultimate decision on whether the findings of the ALJ are reasonable and supported by substantial evidence.  I have concluded that it does not, and I find that the ALJ's failure to accept Dr. Hinke's limitations as ongoing was supported by substantial evidence.

First, I considered SSR 83-20, a ruling that provides guidance on the determination of the onset of disability.  This ruling defines the onset day of disability as the first day an individual is disabled as defined in the Act and the regulations.  The day a claimant stops working because of her disability is of great significance in setting an onset date.  Often the determination of the onset of disability is a difficult task, particularly where there is a degenerative impairment.  In those cases, the ALJ is directed to make reasonable inferences about the progression of an impairment based on the evidence.  The ruling further provides that the alleged onset date of the claimant should be used if it is consistent with all of the evidence available.  Here, Krupa alleged an onset date of December 19, 2002.  In compliance with SSR 83-20, the ALJ accepted Krupa's assertion that her disability **began** on December 19, 2002, and evaluated Krupa's evidence of disability from that date forward.  Where the onset date is determined by accepting the date provided by the claimant and is consistent with the date she was last employed, the ALJ's determination is supported by substantial evidence and it is reasonable for the ALJ to consider

17

the evidence of disability from that date forward.

It also appears that Dr. Hinke was not aware of Krupa's work activities through December 2002. Krupa's continued employment during a period of time that Dr. Hinke had found her unable to work and had imposed significant functional limitations calls into question the validity of Dr. Hinke's opinion.

The ALJ is guided in assessing the weight to be given to treating sources by SSR 96-2p. This ruling provides that controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. However, even if the medical opinion is well-supported, it is not entitled to controlling weight unless it is also consistent with other substantial evidence in the case. Thus, a treating source's opinion on what an individual can still do despite her impairment will not be entitled to controlling weight if substantial, non-medical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion.

Here, the record shows that despite numerous tests and consultative examinations, Dr. Hinke continued to search for a diagnosis that might explain the degree of limitation alleged by Krupa. Various tests on Krupa's neck and low back revealed only mild to moderate degenerative changes that did not account for the degree of pain she described. Rhuemotological and orthopedic evaluations did not provide an answer. Krupa's other treating physicians repeatedly recommended that she increase her physical activities, contrary to Dr. Hinke's recommendation that Krupa limit her activities to seated activity with no bending or fatigue.

As discussed above, the record also establishes that her post-onset treating physicians were primarily focused on weaning Krupa off her dependence on narcotic pain medications.

18

Krupa's post-onset date physical examinations consistently showed no acute distress, a full range of motion (could practically touch her forehead to the ground without difficulty), and normal strength and gait.  Moreover, the objective testing six months prior to Krupa's onset date did not show significant degeneration of the neck and back, or evidence of herniation.

Finally, it appears Krupa's treatment was less frequent following her onset date and she ended all neck and back treatment in June 2003, more than a year prior to the ALJ's decision. This lack of treatment (and resulting lack of prescribed medications) contradicts her subjective complaints, and would support the conclusion that her condition had significantly improved after her onset date.  It is also relevant for purposes of establishing the duration of her impairments.[11] Under these circumstances, the ALJ is not be required to accept questionable functional limitations set prior to the onset of disability when making his residual functional assessment. The ALJ reasonably found that Krupa was not wholly credible with regard to her subjective complaints, and based his functional assessment on an absence of medical evidence to support a finding that Krupa could not return to her past work as a librarian, work she was able to perform when her impairments were arguably more limiting.  Accordingly, the ALJ had substantial evidence to conclude Krupa could perform light work.

I also find Krupa's claim that the ALJ erred in finding she had transferrable skills is without merit.  Krupa argues that the ALJ could not make this finding in the absence of vocational testimony on the issue.  However, vocational testimony would only be relevant if the

---

[11] Having acknowledged that she was not disabled prior to December 2002, Krupa was required to show that her impairments lasted, or were expected to last, for a continuous period of no less than twelve months.  42 U.S.C. § 423(d)(1)(A).  Thus, if the ALJ had found Krupa's neck and back pain caused her to be unable to work for some period of time following December 21, 2002, the lack of any treatment after June 2003 would support a finding that her condition ended less than twelve months after onset, and thus, did not satisfy the duration requirement of the Act.

ALJ found that Krupa was limited to sedentary work.  If applying the medical-vocational guidelines, table no. 1, to an individual with the residual functional capacity for sedentary work, Rule 201.14 (skills not transferable) would require a finding of disability.  Rule 201.15 (skills transferable) would not.  However, the ALJ properly relied on table no. 2, applicable to an individual with the residual functional capacity to perform light work.  Under either Rule 202.14 (skills not transferable), or Rule 202.15 (skills transferable), a finding of not disabled was directed.  Thus, vocational testimony would not affect the ALJ's determination.

Having concluded that the ALJ's determination that Krupa is not disabled is supported by substantial evidence, I grant the Commissioner's motion for summary judgment and deny Krupa's motion for summary judgment.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


LAUREN KRUPA                          :          CIVIL ACTION
                                      :
            v.                        :
                                      :
JO ANNE B. BARNHART,                  :
Commissioner of the                   :
Social Security Administration        :          No. 05-CV-0670


**JUDGMENT AND ORDER**

AND NOW, this     31st    day of May, 2006, it is HEREBY ORDERED that:

1.  Plaintiff's motion for summary judgment is DENIED.

2.  Defendant's motion for summary judgment is GRANTED.

Judgment is ENTERED in favor of Jo Anne B. Barnhart, Commissioner of Social

Security and against Lauren Krupa.

IT IS SO ORDERED.


                        /s/ J. William Ditter, Jr.
                        J. WILLIAM DITTER, JR., S.J.